# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ROSS ROGERS, JR. and<br>JOSEPH ROGERS, | ) | |
| | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | C.A. No. 2019-0035-BWD |
| | ) | |
| ESTATE OF WILLIAM H.<br>RODGERS, SR., LAVONNE<br>RODGERS, LOREN TUNNEL,<br>WILLIAM H. RODGERS, JR.,<br>and RENIA RODGERS, | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Respondents. | ) | |

## POST-TRIAL FINAL REPORT

Final Report: May 14, 2024
Date Submitted: April 10, 2024

Tasha Marie Stevens-Gueh, ANDREW & STEVENS-GUEH, LLC, Georgetown, Delaware; *Attorneys for Petitioners Ross Rogers, Jr. and Joseph Rogers*.

Jason C. Powell, THE POWELL FIRM, LLC, Wilmington, Delaware; *Attorneys for Respondents Estate of William H. Rodgers, Sr. and Lavonne Rodgers*.

**DAVID, M.**

Two surviving children of the late Edith Rogers ("Edith")[1] dispute the validity of a deed transfer through which Edith gifted their brother, now also deceased, real property in Frankford, Delaware. The petitioners assert that the deed, which Edith signed at ninety-five years old in her final month of life, is invalid for lack of capacity or as the product of undue influence. The widow and administrator of the estate of the deceased brother who received the property defends the transfer as the decision of a mother, acting with capacity and of her own volition, who loved all her children equally, gifted her other children real property in years past, and simply wished to give her oldest son his fair share of the family property.

For the reasons that follow, this post-trial final report finds that the petitioners have not carried their burden to prove that Edith lacked capacity or was unduly influenced to transfer the deed, and that the deed is, therefore, valid. It also concludes that the respondents have not established entitlement to damages representing the rental value of the disputed property.

---

[1] This report refers to members of the Rogers/Rodgers family by their first names for clarity; no disrespect or familiarity is intended. Some family members spell their last name with a "d" while others do not; this is not a typo.

# I.  BACKGROUND

The following facts are drawn from the factual stipulations in the parties' Pre-Trial Stipulation and the evidence presented at a two-day trial held on October 31 and November 1, 2023.[2]

## A.  Edith Gifts Property To Two Of Her Three Living Children.

Edith and Ross Havelow Rogers, Sr. ("Ross Sr."), now both deceased, were parents to five children, three of whom were living at the time of the events at issue in this report: William Rodgers, Sr. ("William Sr."), Ross Rogers, Jr. ("Ross Jr."), and Joseph Rogers ("Joe").[3]

By all accounts, Edith loved and wished to treat all three of her living children equally.[4]  At trial, Ross Jr. testified that Edith "felt the same way . . . about . . . [all of] her sons."[5]  Joe agreed that if Edith "gave something to one of [her sons], she w[ould] . . . give something to the other boy[s]."[6]

---

[2] The Pre-Trial Stipulation is cited as "PTS at __".  Trial testimony is cited as "Tr. (Witness) at __".  Trial exhibits are cited as "JX __".

[3] PTS at 3; Tr. (Ross Jr.) at 21:1-17.

[4] *See, e.g.*, Tr. (Lavonne) at 437:22-24 ("Mom Edith, Mom loved her boys.  She did.  She loved her boys."); Tr. (Antanell) at 128:23-129:1 (agreeing that Edith "loved" and "trust[ed]" William Sr.).

[5] Tr. (Ross Jr.) at 55:22-23; *see also id.* at 63:9-15.

[6] Tr. (Joe) at 398:17-399:5; *see also* Tr. (Antanell) at 151:7-10 (agreeing that Edith treated her sons "fairly" and "equally"); Tr. (Eursula) at 187:24-188:1 ("I'm sure she . . . wanted

In 2000, Ross Jr., his wife, Gloria, and their children moved into Edith and Ross Sr.'s home at 32661 Omar Road in Frankford, Delaware (the "Property").[7] At some point thereafter, Edith and Ross Sr. promised to give Ross Jr. a portion of the Property on which to construct a mobile home so that he could "stay around to help [them] out."[8] Ross Sr. died in 2006.[9] After Ross Sr.'s death, Edith told Ross Jr. "to go and do whatever it t[ook] to have a piece of property turned over to [him]."[10] Ross Jr. engaged a surveyor and an attorney, Stephen Parsons, Esquire, to effect the transfer,[11] and on June 9, 2008, Edith executed a deed transferring one and a half acres of the Property to Ross Jr. and Gloria for one dollar.[12]

Separately, on February 14, 2005, also with Mr. Parsons's assistance, Edith transferred real property in Selbyville, Delaware to Joe and his wife, Sarah, for one dollar.[13]

---

to treat them equally."); Tr. (Roslyn) at 209:24-210:1 ("[Edith] loved all her boys the same, equally the same."); *id.* at 213:17-214:5 (agreeing that Edith "loved all her boys equally" and that she gifted the Property to William Sr. because Joe and Ross had received two other properties).

[7] Tr. (Ross Jr.) at 22:12-23:17.

[8] *Id.* at 46:7-13.

[9] *Id.* at 22:8-11.

[10] *Id.* at 46:24-47:3; *see also id.* at 61:10-62:19.

[11] *Id.* at 47:3-6.

[12] JX 4 at 1; *see also* Tr. (Ross Jr.) at 48:12-19.

[13] JX 1-2; *see also* Tr. (Ross Jr.) at 64:7-16; Tr. (Joe) at 399:8-9.

## B. Edith's Health Declines.

In 2012, Edith was ninety years old. At trial, Ross Jr.'s daughters, Eursula Knight and Antanell Bailey, testified that by 2012, Edith required daily assistance from family members, who performed chores around the house, filled and administered her medications, took her to medical appointments, purchased groceries, prepared meals, and paid her bills.[14] According to Antanell, by 2013, Edith was "moving . . . slower"[15] and "more forgetful."[16] From 2012 through 2014, however, Edith's medical records show that she was alert and oriented to her person, place, and time.[17]

In 2015 and 2016, Ross Jr., Gloria, and their daughters Antanell, Eursula, and Roslyn Knight-Hall ("Roslyn"), as well as William Sr.'s then-girlfriend, Lavonne, cared for Edith in her home.[18] William Sr., whom Edith had appointed as her

---

[14] *See* Tr. (Antanell) at 113:12-114:4 (testifying that she saw Edith at least every other day from 2012 through 2017 and "would administer [Edith's] medication"); Tr. (Eursula) at 163:9, 164:24 (testifying that she saw Edith every day from 2012 through 2017 to "help[] . . . with her medicine, . . . her foods[,] . . . go to the store[,] . . . do her grocery shopping[,] . . . cook for her[,] . . . do her laundry[,]" and "help . . . with her bills").

[15] *See* Tr. (Antanell) at 117:1-4 ("[Edith] would . . . grab your hands when you would walk together with her.").

[16] *Id*. at 115:10-19.

[17] *See, e.g.*, JX 10 at 24 (stating that Edith was "alert"); JX 10 at 28-29, 38, 42 (stating that Edith was "alert and oriented x 3" and "affect normal").

[18] Tr. (Ross Jr.) at 27:16-28:12; Tr. (Lavonne) at 426:4-20 (testifying that she spoke with Edith daily and would take her to medical appointments when needed).

attorney-in-fact through a durable power of attorney ("POA") in 2007,[19] began paying Edith's bills.[20] Ross Jr., Antanell, and Eursula's daughter, Japayl Knight ("Japayl"), testified that Edith's "forgetfulness" worsened in 2016, and that Edith lacked motivation for activities she once enjoyed.[21] Roslyn and Antanell testified that "[m]entally, [Edith] began to be a lot [more] forgetful" and would "get stuck in [a] loop . . . forgetting . . . times of [the] day."[22] On the other hand, William Sr.'s son, William Henry Rodgers, Jr. ("William Jr."), and his wife, Kimberly Rodgers ("Kimberly"), both testified that they "did [not] notice any memory deficits with [Edith]" during visits with her in the summers of 2015 and 2016.[23] Records from neurological exams in 2015 and 2016 show Edith continued to be alert and oriented to her person, place, and time.[24]

In September 2016, Edith was hospitalized at Atlantic General Hospital ("Atlantic General") in Berlin, Maryland, after a fall in her home.[25] Edith's intake records reflect that she had suffered a hematoma on the top of her head and was a

---

[19] JX 3.

[20] Tr. (Ross Jr.) at 52:24-53:4; *id*. at 29:4-5, 53:1-4; Tr. (Eursula) at 164:22-165:8.

[21] Tr. (Ross Jr.) at 32:18-33:11, 35:7-15; Tr. (Japayl) at 101:2-12; Tr. (Antanell) at 117:13-21; Tr. (Roslyn) at 194:17-195:6.

[22] Tr. (Roslyn) at 194:17-195:6; *see also* Tr. (Antanell) at 117:13-21.

[23] Tr. (Kimberly) at 352:21-353:9; Tr. (William Jr.) at 366:1-367:3.

[24] *See, e.g.*, JX 10 at 3, 5, 7, 9, 12, 16, 19.

[25] JX 11 at 4; Tr. (Roslyn) at 195:12-24.

5

"poor historian," but also "sp[o]k[e] coherently," was alert and oriented to her person, place, and time, and communicated with her family present.[26] Additional medical records show that during the four days she was hospitalized at Atlantic General, she was alert, but her orientation to person, place, and time varied depending on the time of day.[27] Ross Jr., Antanell, Eursula, and Roslyn testified that Edith "was very confused" and "needed assistance [with] [al]most everything that she d[id]" during her hospital stay.[28]

On September 11, 2016—four days after she was admitted to Atlantic General—Edith was discharged to Berlin Nursing and Rehabilitation Center ("Berlin Nursing"), where she stayed for approximately eight weeks.[29] Edith's

---

[26] JX 11 at 4, 19.

[27] *See, e.g.*, JX 11 at 25-27 (noting that on September 8, 2016, at 1:02 a.m., Edith "[wa]s awake and alert at the end of [her] exam" and "oriented to time, place, [and] person" with "all cranial nerves intact" and "no motor defici[ency]"); *id*. at 32 (noting that on September 8, 2016, at 12:49 p.m., Edith was "alert" but "not oriented"); *id*. at 39-40 (noting that on September 8, 2016, at 2:44 p.m., Edith could verbally communicate her "needs/ wants" with "intact" orientation but had "impaired" commands, memory, problem solving, and "impaired decreased insight into impact deficits on safely completing functional activities"); *id*. at 43 (noting that on September 8, 2016, at 3:02 p.m., Edith was "awake; oriented to person, place" and able to "make needs/wants known"); *id*. at 64 (noting that on September 8, 2016, at 12:30 p.m., Edith was "alert awake and oriented"); *id*. at 50, 56 (noting that on September 8, 2016, at 3:34 p.m. and 4:36 p.m., Edith was "alert," "not oriented," and had judgment and memory intact with normal mood); *id*. at 70 (noting that on September 11, 2016, at 10:32 a.m., Edith was "alert" and "not oriented" with normal mood).

[28] Tr. (Ross) at 30:18-31:7, 95:1-8; Tr. (Eursula) at 169:22-170:11; Tr. (Roslyn) at 197:19-198:7.

[29] JX 12 at 4.

6

Berlin Nursing records suggest that during this period, she was "a poor historian," but on most days was oriented to her person, on some days had "appropriate judgment," and could "report s[igns]/s[ymptoms]" and "make her needs known."[30]

Roslyn noticed that while Edith was at Berlin Nursing, "she was playful sometimes" but "was[] n[o]t moving around. . . .[,] would[] n[o]t do things on her own," and "was[] n[o]t herself."[31]  Antanell testified that she had no "meaningful" interactions with Edith during this period,[32] while Eursula claimed to see no improvement in Edith's condition.[33]  Ross Jr. "could[] n[o]t really tell" whether Edith's condition improved.[34]  But William Jr. testified that when he visited, Edith remained "in good spirits," sat upright and moved around, showed no signs of confusion, and recognized her family members.[35]

---

[30] *See, e.g.*, JX 12 at 7 (noting that on September 12, 2016, Edith was "[o]riented to person, place, month, and year" with "[s]hort-term registration and recall normal"); *id*. at 57 (noting that on September 23, 2016, Edith was "awake[,] alert[,] verbal[,] [and] oriented"); *id*. at 14 (stating that on September 27, 2016, Edith was oriented to person and "sp[oke] to and recognize[d] family members"); *id*. at 43-44 (stating that on October 7 and 8, 2016, Edith was "verbal[,] alert[,] oriented[,] [and] [a]ble to make needs known"); *id*. at 9 (stating that on October 27, 2016, Edith was oriented to person and place, and able to report her signs and symptoms and make her needs known, but was "[un]sure how long she ha[d] been [t]here"); *id*. at 21 (stating that on October 20, 2016, Edith was "awake[,] alert[,] oriented[,] verbal[,] and [wa]s able to make needs known").

[31] Tr. (Roslyn) at 199:2, 199:10-200:16.

[32] Tr. (Antanell) at 119:17-21.

[33] Tr. (Eursula) at 171:2-23.

[34] Tr. (Ross Jr.) at 31:23-32:1.

[35] Tr. (William Jr.) at 357:10-358:7, 367:16-18; *see also* Tr. (Kimberly) at 346:20-347:20.

On November 1, 2016, Edith was discharged from Berlin Nursing and returned home.[36] The discharge paperwork reported that Edith was "[o][riented] X 2," "very forgetful," "answer[ed] most questions . . . [with] . . . limited eye contact," was a "very poor historian," and was "not able to understand d[ischarge] instructions."[37]

When Edith returned home, Millenium Home Health ("Millenium") administered nursing care at the Property. Some medical records from that period suggest she was oriented to person, place, and time, and showed no memory deficiencies or impaired decision-making,[38] though she needed assistance for all activities.[39] Others suggest Edith was "forgetful" and "fail[ed] to recognize familiar persons/places" or "recall events of [the] past 24 hours . . . ."[40]

On November 17, 2016, Edith was admitted to Delaware Hospice to receive care at home.[41] An "Initial Comprehensive Assessment" indicated that Edith had

---

[36] JX 12 at 4.

[37] *Id*. at 4-5.

[38] *See, e.g.*, JX 16 at 4, 11, 24-25, 27.

[39] *See id*. at 34, 39; *see also id*. at 44, 46 (noting that the family was concerned that Edith had not "sprung back" and was informed of potential hospice care); *id*. at 50-52 (assessing Edith as "weak" due to decreased eating and drinking).

[40] *Id*. at 65.

[41] *Id*. at 70. William Sr. signed Edith's paperwork with Delaware Hospice. *See* JX 13 at 12.

"Alzheimer's dementia," but did not identify when, if ever, such a diagnosis was made.[42] Additional Delaware Hospice records show that Edith's orientation to her person, place, and time and ability to "answer question[s] appropriately" varied day-to-day over the following month.[43]

At trial, Lavonne testified that Edith "was still in her right mind" and that she "saw [no] memory deficits or confusion . . . the entire time [she] . . . kn[ew] [Edith]."[44] But Ross Jr. and Joe admitted that Edith had both good and bad days.[45] On the good days, Edith could remember what day it was, who had come to visit, and what she had for lunch, and could make her needs known.[46] Ross Jr. agreed that "[w]hen [Edith] left [Berlin Nursing] November the 1st . . . she probably could" sign a deed.[47] On the bad days, though, Edith talked to Ross Jr. about events "in the '40s and '30s and back when she was a teenager" and "call[ed] [hi]m by [his] brother's

---

[42] JX 13 I at 109. It is unclear from the trial record whether, and if so, when, Edith was diagnosed with Alzheimer's or dementia. Edith's Atlantic General records do not reflect such a diagnosis. *See generally* JX 11. Berlin Nursing records state that Edith "ha[d] some dementia." *See, e.g.*, JX 12 at 4, 12, 17. Millenium records do not document a diagnosis or any signs of dementia. *See* JX 16 at 3-4. Delaware Hospice records identify an "Alzheimer's dementia" diagnosis but do not indicate when such a diagnosis was made. JX 13 I at 109.

[43] JX 13 II at 3, 7, 12, 36, 43; JX 13 III at 2, 7-8, 13-14, 17, 19, 22, 24-26, 28, 75.

[44] Tr. (Lavonne) at 433:22-434:4, 461:8-12.

[45] Tr. (Ross Jr.) at 70:14-17; Tr. (Joe) at 400:13-21, 402:8-24.

[46] Tr. (Ross Jr.) at 36:3-37:13, 94:15-21.

[47] *Id*. at 81:4-7.

[and] dad's name."[48]  Antanell, Roslyn, Eursula, and Japayl testified that Edith's physical and mental condition continued to "decline[]."[49]

### C.  Edith Executes A Deed Transferring The Property To William Sr.

Edith's medical records show that on December 2, 2016, Edith was "peaceful" and "oriented to person" but "forgetful."[50]  Three days later, on December 5, 2016, Edith executed a deed transferring the Property to William Sr. (the "Deed").

As of trial, both Edith and William Sr. were deceased, and the events leading up to the execution of the Deed are, therefore, not entirely clear.  According to Lavonne, on the morning of December 5, 2016, Edith knew who she was and recognized other family members as they left for work.[51]  That day, Lavonne heard Edith ask William Sr. if "[he] did what [she] told [him] to do?"[52]  William Sr. responded that he had.  William Sr. and Lavonne then helped Edith into the car

---

[48] *Id*. at 37:16-38:12.

[49] Tr. (Japayl) at 102:6-7, 106:19-23 (noting Edith "declined" "physically and mentally," became more reserved, and had "no idea what was going on"); Tr. (Antanell) at 121:3-12 (testifying Edith had "diminish[ed]" physically, and mentally, "[s]he was slipping farther away from [the family]" and could no longer remember "really easy stuff"); Tr. (Eursula) at 173:18-175:2 (testifying that Edith had no improvement in her physical condition or mental abilities and "did not understand anything that was going on"); Tr. (Roslyn) at 201:16 (testifying that she observed no improvement in Edith's physical condition or mental abilities).

[50] JX 13 II at 15.

[51] Tr. (Lavonne) at 434:5-24.

[52] *Id*. at 435:4-10. At trial, Antanell testified that Edith was combative in the morning, but during her deposition, Antanell testified that Edith was "fine." Tr. (Antanell) at 142:8-24.

10

wearing a "house gown," "coat," and "slippers,"[53] and William Sr. directed Lavonne to drive them to the Law Office of Stephen Parsons, P.A.[54]

From Ross Jr.'s house, Japayl saw William Sr. help Edith into Lavonne's car.[55] Because Edith left the house only for medical appointments, this raised alarm bells for Japayl, who alerted other family members to what she had seen.[56]

When William Sr., Lavonne, and Edith arrived at the Law Office of Stephen Parsons, P.A., William Sr. entered the building while Lavonne and Edith remained in the car.[57] Two women from Mr. Parsons's office came out to speak with Edith, asking her name, address, who she was with, their relationship, and her reason for being there.[58] Lavonne testified that Edith correctly provided her name and age, and explained that she intended to gift the Property to William Sr.[59] One of the women, Leah Garrett—a notary in Mr. Parsons's office—explained "the[] documents" to Edith, who had "no questions whatsoever."[60] Edith then executed the Deed

---

[53] Tr. (Lavonne) at 457:1-458:3.

[54] *Id*. at 435:13-20.

[55] Tr. (Japayl) at 103:1-105:6.

[56] Tr. (Ross Jr.) at 42:13-43:1; Tr. (Antanell) at 129:7-14; Tr. (Eursula) at 175:8-176:2; Tr. (Roslyn) at 205:19-:24.

[57] Tr. (Lavonne) at 436:1-19.

[58] *Id*. at 436:21-437:2.

[59] *Id*. at 438:12-17, 460:3-12.

[60] *Id*. at 438:12-21.

transferring the Property to William Sr.[61]  On the Deed, Edith spelled her last name "Rodgers," though on prior legal documents, she spelled it "Rogers."[62]

Mr. Parsons testified that he did not specifically recall the Deed, but that his practice would have been to speak with Edith before preparing the Deed.[63]  Ms. Garret likewise did not remember the Deed but agreed that she would not have notarized a deed without Edith "fully understand[ing] th[e] [Deed]" or if she "felt that someone [had] pressured [her] . . . ."[64]

On their way home, Edith requested a fish sandwich from McDonald's.[65]  Later that day, several family members asked Lavonne, William Sr., and Edith where they had gone.[66]  All three refused to answer.[67]  According to Ross Jr. and Roslyn, the "only thing [Edith] would tell [the]m [was] that she got a fish sandwich."[68]

---

[61] JX 5; Tr. (Lavonne) at 438:5-11, 460:15-19.

[62] *See, e.g.*, JX 3, 4, 7.

[63] Tr. (Parsons) at 383:20-384:2.

[64] Tr. (Garrett) at 388:16-18, 390:14-391:17, 392:7-11.

[65] Tr. (Lavonne) 438:9-11.

[66] Tr. (Roslyn) at 203:12-204:7.

[67] Tr. (Lavonne) at 439:4-14.

[68] Tr. (Ross Jr.) at 43:8-13; Tr. (Roslyn) at 204:11-18.  Lavonne testified that Edith told them it was "none of [their] business."  Tr. (Lavonne) at 493:9-18.

**D.    Edith Passes Away And Petitioners Learn That The Property Was Transferred To William Sr.**

Delaware Hospice records show that on December 10, 2016, five days after the Deed transfer, Edith was "[a]lert, [re]laxed/calm, [o]riented to familiar objects, [and] [had] slowed thought process."[69]  On December 15 and 19, 2016, Edith was "oriented to person, . . . place, . . . [and] to time."[70]  Less than six weeks later, on January 14, 2017, Edith died intestate.[71]  She was ninety-five years old.

After Edith's death, Petitioners learned of the Deed.[72]  According to Ross Jr., when questioned about the Deed, William Sr. promised to "make it right."[73]  William Sr. permitted Antanell and her family to move into the Property[74] but, according to Lavonne, later told Lavonne "to get a paper and . . . evict Antanell . . . from the residence."[75]

---

[69] JX 13 II at 23.

[70] *Id*. at 31, 36.

[71] PTS at 3.  Edith's death certificate identified Alzheimer's as her cause of death.  *See* JX 11 at 1.

[72] Tr. (Ross Jr.) at 41:15-24; Tr. (Japayl) at 107:8-15; Tr. (Eursula) at 176:13-14.  William Jr. learned of the Deed transfer from Joe two or three weeks after his father died.  Tr. (William Jr.) at 362:12-23.

[73] Tr. (Ross Jr.) at 53:16-54:20.

[74] Tr. (Lavonne) at 440:1-17.

[75] *Id*. at 429:15-18.

Less than a year after Edith's passing, on September 25, 2017, William Sr. and Lavonne married.[76] William Sr. died intestate eight months later, on May 11, 2018.[77] Lavonne inherited a life estate in the Property.[78] In June 2018, Lavonne sent two letters demanding that Antanell "vacate the [Property]" and that Ross and Gloria "pay lot rent in the amount of 400.00/ monthly."[79] On August 22, 2018, Petitioners responded through counsel, asserting their "intention to file a Petition to Contest the Deed to have it invalidated . . . ."[80] Antanell and her family still reside at the Property;[81] Lavonne claims Antanell has excluded her from the Property.[82]

### E.    Procedural History

On January 17, 2019, Petitioners initiated this action through the filing of a Verified Complaint to Invalidate a Deed for Undue Influence (the "Complaint").[83] The Complaint alleges that "[Edith] lacked the requisite mental capacity to execute the [D]eed transferring [the] [Property]" and that "William [Sr.] and Lavonne . . .

---

[76] *Id*. at 418:17.

[77] PTS at 3.

[78] *Id*.

[79] JX 15 at 13-14; Tr. (Lavonne) at 448:2-24.

[80] JX 15 at 16.

[81] Tr. (Antanell) at 134:9-14; Tr. (Joe) at 404:5-18.

[82] Tr. (Lavonne) at 444:3-8.

[83] Verified Compl. To Invalidate A Deed For Undue Influence [hereinafter, "Compl."], Dkt. 1.

exerted undue influence over" her.[84]  The Complaint seeks an order invalidating the Deed.[85]

On May 20, 2019, Respondents answered the Complaint and asserted counterclaims (the "Counterclaims").[86]  The Counterclaims allege that Lavonne has a valid life estate in the Property and seek damages, including the fair rental value of the Property.[87]

On October 17, 2023, Respondents filed a motion *in limine* to preclude the expert testimony of Dr. Janis Chester.[88]  The Court held a two-day trial on October 31 and November 1, 2023.[89]  Post-trial briefing was completed on April 10, 2024.[90]

---

[84] Compl. ¶¶ 17, 20.

[85] *Id*. ¶ 25.

[86] Ans. And Countercl. [hereinafter, "Ans."], Dkt. 16.

[87] Ans. ¶¶ 31-45.

[88] Resp'ts' Mot. To Preclude The Expert Test. Of Dr. Janis Chester ¶ 10, Dkt. 49.

[89] Dkt. 56.

[90] Resp't Lavonne Rodgers' Post-Trial Op. Br. In Supp. Of Countercls. [hereinafter, "ROB"], Dkt. 63; Pet'rs Ross Rogers, Jr. And Joseph Rogers' Post-Trial Op. Br. [hereinafter, "POB"], Dkt. 64; Resp't Lavonne Rodgers' Post-Trial Ans. Br. [hereinafter, "RAB"], Dkt. 69; Pet'rs Ross Rogers, Jr. And Joseph Rogers' Post-Trial Ans. Br. [hereinafter, "PAB"], Dkt. 70; Pet'rs' Ross Rogers, Jr. And Joseph Rogers' Post-Trial Reply Br. [hereinafter, "PRB"], Dkt. 72; Resp't Lavonne Rodgers' Post-Trial Reply Br. [hereinafter, "RRB"], Dkt 73.

## II.  ANALYSIS

From the foregoing factual background, Petitioners seek an order invalidating the Deed on grounds of lack of capacity and undue influence.  Respondents, on the other hand, seek an order declaring that the Deed is valid and awarding damages for the rental value of the Property from June 2017 until the Property is vacated, with pre- and post-judgment interest.

### A.  Petitioners' Claims Are Not Barred By Laches.

As a threshold matter, Respondents contend that Petitioners' claims are untimely.  "Setting aside a transfer of real property is a remedy solely within the jurisdiction of the Court of Chancery.  As there is no concurrent remedy at law, no analogous statute of limitations would appear to apply."  *Schmidt, by Meekins v. Schmidt*, 1994 WL 198704, at *3 n.1 (Del. Ch. May 3, 1994).  In the absence of an analogous statute of limitations, Respondents contend that the equitable doctrine of laches bars Petitioners' claims.

"The affirmative defense of laches generally requires the establishment of three things: first, knowledge by the claimant; second, unreasonable delay in bringing the claim; and third, prejudice to the defendant."  *Homestore, Inc. v. Tafeen*, 888 A.2d 204, 210 (Del. 2005).  According to Respondents, Petitioners were on at least inquiry notice of the Deed by December 7, 2016, when it was publicly recorded with the Sussex County Recorder of Deeds, but "waited over two years until January

16

17, 2019, to initiate any litigation related to the transfer of the Property."[91] Respondents note that "[i]n the time that passed, both [Edith] and William Sr. . . . passed away and were no longer able to explain the details of the transaction to anyone."[92] As a result, at trial, "[t]he only living people with personal knowledge of the drafting and execution of the Deed [we]re Mr. Parsons and Leah Garrett[,]" who, "due to the passage of time[,] [did not have] a clear recollection of the circumstances surrounding the drafting and execution of the Deed."[93]

"The laches analysis necessarily depends upon the totality of the circumstances of each individual case. There is no rigid rule that can be applied to every case." *Hudak v. Procek*, 806 A.2d 140, 155 (Del. 2002). Here, I find Petitioners' approximately two-year "delay" in filing suit was not unreasonable and did not unfairly prejudice Respondents. Certainly, the passage of time may work prejudice when important witnesses become unavailable to testify. *See, e.g.*, *Fike v. Ruger*, 752 A.2d 112, 114 (Del. 2000) (affirming entry of summary judgment on laches grounds where the defendants delayed more than a decade before bringing claims and two "key witnesses" died in the interim); *Buddenhagen v. Clifford*, 2024

---

[91] RAB at 18.

[92] *Id*. at 18-19; *see also id*. at 19 ("Due to the delay . . . the only family members with personal knowledge of how the transaction took place[] were deceased by the time the Petitioners initiated their challenge.").

[93] *Id*. at 19.

WL 2106606, at *28 (Del. Ch. May 10, 2024) (concluding that laches defense foreclosed certain claims given "the sheer magnitude of evidentiary loss" that "occurred over the past thirty years," including the death of key witnesses). Here, however, the most important witness, Edith, died just one month after the Deed was recorded, and nothing in the record suggests Petitioners should have anticipated William Sr.'s passing less than a year and a half later. The timing is unfortunate, but under the circumstances, it does not support a laches defense.

## B. Petitioners Bear The Burden Of Proof.

"Generally, voluntary transfers—gifts, payments, contractual exchanges, and other transfers made on a person's prerogative and unforced by legal obligation— are valid and legally enforceable." *Mitchell v. Reynolds*, 2009 WL 132881, at *7 (Del. Ch. Jan. 6, 2009). But if the transferor lacks capacity, or a transfer is the product of undue influence, then the transfer is invalid. *Id*. at *8. Generally, "[a] challenger bears the burden of proving . . . incapacity, as well as the exertion of undue influence." *Id*. at *11. "The burden of proof shifts where the challenger shows by clear and convincing evidence that the parties were in a fiduciary or confidential relationship." *Id*. at *8 n.71. "In those instances, the proponent must demonstrate the absence of undue influence and the transfers' fairness by a preponderance of the evidence, rebutting a presumption of fraud." *Id*. at *9.

18

If an *inter vivos* transfer is a "will substitute" or otherwise testamentary in nature, other burden-shifting rules apply. In that case, "the party attacking testamentary capacity . . . bears the burden of establishing that the decedent was legally incapable of executing a valid will [or will substitute]." *In re Will of Melson*, 711 A.2d 783, 786 (Del. 1998). The challenger also "carries the burden of proving that the will [or will substitute] was a product of undue influence." *Id*. However, as the Delaware Supreme Court held in *Melson*,

> the presumption of testamentary capacity does not apply and the burden on claims of undue influence shifts to the proponent where the challenger of the will is able to establish, by clear and convincing evidence, the following elements: (a) the will was executed by "a testatrix or testator who was of weakened intellect"; (b) the will was drafted by a person in a confidential relationship with the testatrix; and (c) the drafter received a substantial benefit under the will.

*Id*. at 788 (citation omitted).

Petitioners frame their analysis under *Melson*; Respondents argue that *Melson* does not apply because the Deed is not a will substitute.[94] "A will substitute 'is an arrangement respecting property or contract rights that is established during the donor's life, under which (1) the right to possession or enjoyment of the property or to a contractual payment shifts outside of probate to the donee at the donor's death; and (2) substantial lifetime rights of dominion, control, possession, or enjoyment are

---

[94] POB at 19; RAB at 21-23.

retained by the donor.'" *Mitchell*, 2009 WL 132881, at *11 n.99 (quoting *Tucker v. Lawrie*, 2007 WL 2372616, at *7 (Del. Ch. Apr.17, 2007), *aff'd*, 956 A.2d 642 (Del. 2008)). The Deed here was not a will substitute because it immediately transferred Edith's interest in the Property to William Sr. without retaining any rights or interests therein.[95] Accordingly, the *Melson* framework does not apply.[96]

That means Petitioners bear the burden of proof unless they have demonstrated by clear and convincing evidence that Edith and William Sr. "were in a fiduciary or confidential relationship." *Mitchell*, 2009 WL 132881, at *9. "To establish proof by clear and convincing evidence means to prove something that is highly probable, reasonably certain, and free from serious doubt." *Utz v. Utz*, 2003 WL 22952579, at *2 n.11 (Del. Ch. Dec. 5, 2003) (citation and internal quotation marks omitted).

---

[95] *Compare Tucker*, 2007 WL 2372616, at *6 (finding a deed transfer was a will substitute where the decedent "retained substantial lifetime rights of dominion, control, possession, and enjoyment in the [p]roperty," noting that "a joint tenancy with right of survivorship is frequently used as a will substitute").

[96] Even if *Melson* applied, the burden of proof would not shift to Respondents because the Deed was not "drafted by a person in a confidential relationship with the testatrix"—it was drafted by an attorney. *See Melson*, 711 A.2d at 787 ("[W]here the drafter of the will is a lawyer acting in a lawyer-client relationship, sufficient safeguards exist to permit the application of the usual presumptions and burden of proof."); *In re Est. of Seppi*, 2011 WL 4132374, at *12 (Del. Ch. Aug. 30, 2011) (explaining that "the *Melson* standard would not apply to [the] POA or [the] Estate Documents because those documents were drafted by independent, licensed attorneys who did not stand to benefit from the dispositions made in the documents").

"A number of circumstances may give rise to a fiduciary relationship." *Mitchell*, 2009 WL 132881, at *9. For example, "[f]ormal fiduciary relationships exist between general partners, guardians and wards, and attorneys and clients[,]" as well as trustees and beneficiaries, executors and estates, and agents and principals. *Id*. Additionally, "outside a formally recognized fiduciary relationship, a relationship predicated on particular confidence or reliance may give rise to fiduciary obligations." *Id*. A confidential relationship exists where "circumstances make it certain the parties do not deal on equal terms but on one side there is an overmastering influence or on the other weakness, dependence or trust, justifiably reposed." *In re Will of Wiltbank*, 2005 WL 2810725, at *6 (Del. Ch. Oct. 18, 2005) (internal quotation marks omitted) (quoting *In re Will of Szewzcyk*, 2001 WL 456448, at *5 (Del. Ch. Apr. 26, 2001)).

In determining whether a confidential relationship exists, "[t]his Court has frequently looked to the transferor's extensive or exclusive reliance on another for physical, emotional, or decisional support, a query informed by the transferor's disposition and mental and physical capabilities, as well the existence and extent of any additional support network." *Mitchell*, 2009 WL 132881, at *9. The cases on which Petitioners rely illustrate this point. For example, Petitioners point to *Faraone v. Kenyon*, where a son stood in a fiduciary relationship with his mother because she "depended entirely upon [him] to manage her affairs, to oversee the upkeep of her

21

home, and to give her personal care and assistance as well as companionship." 2004 WL 550745, at *9 (Del. Ch. Mar. 15, 2004). In *Mitchell v. Reynolds*, the Court found a confidential relationship between a mother and daughter where the mother was "isolated from the rest of her family." 2009 WL 132881, at *9-10. And in *Coleman v. Newborn*, a petitioner's "alienation from the rest of her family, including all of her children and their spouses, and her consequent dependency on her sister for physical and emotional support and a growing list of small and large chores[,]" gave rise to a confidential relationship. 948 A.2d 422, 431 (Del. Ch. 2007).[97]

Here, Petitioners did not prove by clear and convincing evidence that Edith and William Sr. stood in a fiduciary or confidential relationship when the Deed was executed. At the time Edith signed the Deed, she was ninety-five years old and received daily care. But it is plain from the trial record that Edith was *surrounded* with "physical, emotional, [and] decisional support,"[98] not only from William Sr., but her other two sons, their spouses, several grandchildren, and great-grandchildren. Indeed, Ross Jr., Joe, Antanell, Japayl, Eursula, Roslyn, and Lavonne all testified to

---

[97] *See also, e.g.*, *McGee v. Est. of Hopkins*, 2022 WL 17492353, at *5 (Del. Ch.) (finding, in the context of a will, that a confidential relationship existed between the decedent and his wife of thirty years because she acted as "his primary caregiver around the time that the [w]ill was executed"), *R. & R. adopted sub nom. Mcgee v. Hopkins*, 2022 WL 17633575 (Del. Ch. 2022).

[98] *Mitchell*, 2009 WL 132881, at *9.

22

their close relationship with Edith and the daily support they each provided her.[99]

Moreover, nothing in the record suggests that William Sr. had an "overmastering influence" over Edith. No family member ever witnessed William Sr. treat his mother poorly, restrict other family members' access to her, or exert influence over her.[100] In light of those facts, Petitioners failed to prove by clear and convincing evidence that William Sr. and Edith stood in a confidential relationship in which they did not deal on equal terms.

In so finding, I acknowledge that under the POA executed in 2007, Edith appointed William Sr. as her attorney-in-fact, and William Sr. thereby "assume[d] the obligations of a fiduciary." *Coleman*, 948 A.2d at 429. But, importantly, William Sr. did not sign the Deed as Edith's attorney-in-fact or otherwise facilitate the transaction using the POA.[101] And while Edith's decision to entrust William Sr.

---

[99] *See* nn.14, 18, *supra*.

[100] Tr. (Ross Jr.) at 73:6-75:22; Tr. (Antanell) at 150:5-11; Tr. (Japayl) at 110:7-12; Tr. (William Jr.) at 358:22-361:3; Tr. (Kimberly) at 347:348:22.

[101] *Compare Schock v. Nash*, 732 A.2d 217, 220 (Del. 1999) (affirming the Court of Chancery's finding that a daughter breached her duty of loyalty where the daughter used her status as attorney-in-fact "to make gratuitous transfers of [her mother's] property to [herself] and her family") *with Minieri v. Bennett*, 2013 WL 6113911, at *15 (Del. Ch. Nov. 13, 2013) (noting that where the respondent "did not utilize the power of attorney to facilitate . . . the transfer[] in question[,]" "in order to shift the burden to [the respondent], . . . petitioners must prove by clear and convincing evidence that [the decedent] and [the respondent] were in a confidential relationship at the time of the transfer"). *See also Coleman*, 732 A.2d at 226 (finding a confidential relationship existed between the transferor and transferee regardless of whether a power of attorney was used to effectuate the challenged transfer).

to act as her attorney-in-fact under the POA is one fact that weighs in favor of finding a confidential relationship,[102] the balance of the evidence does not.

To summarize, Petitioners failed to demonstrate a confidential relationship; they therefore bear the burden to prove by a preponderance of the evidence that Edith lacked capacity to execute the Deed or that the Deed was the product of undue influence.

### C. Petitioners Did Not Prove That Edith Lacked Capacity To Execute The Deed.

Petitioners first contend that Edith lacked capacity to execute the Deed.[103]

Under Delaware law, a person lacks capacity to transfer property if, at the time she is conveying the property, she "is unable to understand in a reasonable manner the nature and consequences of the transaction . . . ." *Barrows v. Bowen*, 1994 WL 198724, at *4 (Del. Ch. May 10, 1994) (citation omitted); *see also Townsend v. Townsend*, 137 A.2d 381, 382 (Del. Ch. 1957) ("[T]he capacity to

---

[102] *See Ray v. Williams*, 2020 WL 1542028, at *29 (Del. Ch. Mar. 31, 2020) (noting that a father's decision to execute "a power of attorney in [his daughters'] favor" "[r]einforc[ed] their existing fiduciary relationship"); *Coleman*, 948 A.2d at 429 (explaining that an agent's status as attorney-in-fact and her personal relationship with the principal, "in a strong sense, . . . [we]re two aspects of the same reality" because "the reasons [the principal] made [the agent] her attorney-in-fact ar[o]se out of the long-term relationship of trust between [them]").

[103] POB at 3; PRB at 4.

transfer property must necessarily be evaluated as of the time of the transaction under attack[.]").

On the record before me, I find that Petitioners failed to meet their burden to prove by a preponderance of the evidence that Edith lacked capacity to sign the Deed. To prove that Edith lacked capacity, Petitioners offered the expert reports and testimony of Dr. Janis Chester, M.D., a board-certified psychiatrist.[104] For several reasons, I give that evidence little weight. First, Dr. Chester's reports offer an expert opinion on "decision making capacity" and "medical capacity," rather than legal capacity under Delaware law.[105] At trial, Dr. Chester admitted she did not learn of Delaware's standard for legal capacity until after she completed her reports.[106] This Court has rejected expert opinions that failed to apply the correct legal standard for capacity. *See, e.g.*, *In re Langmeier*, 466 A.2d 386, 402-03 (Del. Ch. 1983) (rejecting an expert opinion that failed to apply the correct standard for legal capacity). Second, Dr. Chester's reports are of limited probative value because they are based solely on medical records and not "personal interactions with [Edith] or with those who had interacted with h[er]." *McGee*, 2022 WL 17492353, at *7; *see also In re Est. of Justison*, 2005 WL 217035, at *7 (Del. Ch. Jan. 21, 2005) (giving

---

[104] JX 14 at 1; Tr. (Dr. Chester) at 235:21.

[105] *See* JX 17 at 1; JX 18 at 1, 4.

[106] Tr. (Dr. Chester) at 289:22-290:4.

25

an expert's "opinion less weight than [the Court] otherwise would" because the expert "never met [the decedent], never treated her, . . . [and] never discussed her care or medical history with any of her treating physicians"). And finally, Dr. Chester limited her review to medical records through November 16, 2016, three weeks before the Deed was executed.[107] Dr. Chester's failure to consider medical records directly before and after the Deed was signed casts doubt on her conclusions. *See In re Will of Cauffiel*, 2009 WL 5247495, at \*5 (Del. Ch. Dec. 31, 2009) (finding the value of a medical expert's testimony was impaired "because of what he either could not, or chose not, to consider when making his determination").

The record evidence likewise does not prove by a preponderance of the evidence that Edith lacked capacity to sign the Deed. Rather, the evidence shows that at the time Edith signed the Deed, she had good days and bad days. On the bad days, she was "forgetful" and "fail[ed] to recognize familiar persons [and] places" or "recall events of [the] past 24 hours . . . ."[108] But on the good days, she was oriented to her person, place, and time, such that she could have understood the

---

[107] Tr. (Dr. Chester) at 324:2-6

[108] JX 16 at 65; *see also* nn.45, 48-49, *supra*.

26

nature and consequences of the Deed transfer.[109]  In fact, Ross Jr. agreed that there were days when Edith "probably could" have signed a deed.[110]

Petitioners did not prove that December 5, 2016, the day Edith signed the Deed, was more likely than not a bad day, rather than a good day.  Notably, three days before Edith signed the Deed, she was "oriented to person."[111]  The day she signed the Deed, she recognized family members, though she evaded (perhaps intentionally) questions about where she went when she left her house to sign the Deed.[112]  Ten and fourteen days later, Edith was oriented to her person, place, and time.[113]  Petitioners make much of the fact that Edith signed her last name "Ro_d_gers," rather than "Rogers," on the Deed,[114] but the trial record shows that other family members spelled their last name with a "d" at various points in time.[115]

---

[109] *See* JX 13 II at 36; nn.44-46, *supra*.

[110] *See* n.47, *supra*.

[111] JX 13 II at 15.

[112] *See* nn.51, 66-68, *supra*.

[113] JX 13 II at 31, 36; Tr. (Lavonne) at 443:5-24.

[114] PRB at 9.

[115] *See* Tr. (Ross Jr.) at 24:17-19 (testifying that Edith spelled her last name without a "d"); Tr. (Roslyn) at 211:4-9 (same); *but see* Tr. (Ross Jr.) at 51:4-9 (testifying that William Sr.'s death certificate spelled his last name with a "d"); *id*. at 57:11-21 (noting that "when [he] w[as] younger, [he] . . . spell[ed] it R-o-d-g-e-r-s" but "[c]hanged [it] . . . while in [N]avy"); Tr. (Joe) at 405:12-406:11 (stating that he has spelled his last name with a "d" and did not remember how Edith spelled her last name).

On balance, "these facts indicate that [Edith] was struggling with her memory . . . [but] they do not overcome the presumption that she possessed . . . capacity at the time she executed" the Deed. *Cauffiel*, 2009 WL 5247495, at *6. If Respondents bore the burden of proof, a different result might obtain. But on the record before me, I do not find that Edith more likely than not lacked capacity to sign the Deed.

**D.      Petitioners Did Not Prove That The Deed Was The Product Of Undue Influence.**

Alternatively, Petitioners contend that the Deed is invalid because it was the product of William Sr.'s undue influence over Edith.

"Undue influence occurs when a party exerts immoderate influence under the circumstances that overcomes the transferor's free will, resulting in a transfer that is not of her own choice and mind." *Mitchell*, 2009 WL 132881, at *8. "Undue influence may be exercised in any number of ways, including by 'solicitation, importunity, flattery, putting in fear or in some other manner.'" *Id.* (citation omitted). The elements of undue influence are: "(1) a susceptible grantor; (2) the opportunity to exert influence; (3) a disposition to do so for an improper purpose; (4) the actual exertion of such influence; and (5) a result demonstrating its effect." *Scott v. Scott*, 2013 WL 5298462, at *4 (Del. Ch. Sept. 13, 2013).

Taking the elements in order, the evidence suggests that Edith likely was a susceptible grantor. "There is no precise definition or defining feature of susceptibility, but the analysis is informed by the subject's capacity and does not

28

require an advanced degree of debilitation." *In re Est. of Dougherty*, 2016 WL 4130812, at \*10 (Del. Ch. July 22, 2016). "The Court has previously determined an individual to be susceptible where [s]he suffered 'diminished capacity to take care of basic daily tasks' and 'needed to rely on the help of family members and [the alleged influencer].'" *Ray*, 2020 WL 1542028, at \*32 (citation omitted). The evidence shows that when Edith signed the Deed, she was ninety-five years old, was in hospice care, and required daily support from professional caretakers and family members. Those facts suggest she was susceptible to undue influence.

The record also shows that William Sr. may have had an opportunity to exert undue influence. He visited with Edith regularly and drove her to the Law Office of Stephen Parsons, P.A. where the Deed was signed. On the other hand, many other family members had equal access to Edith; she was not isolated. *See In re Est. of Hammond*, 2012 WL 3877799, at \*4 (Del. Ch. Aug. 30, 2012) (finding opportunity element was not met where the petitioner presented "no evidence that [the decedent] was reliant upon the Respondent, that the Respondent was able to isolate him, or that circumstances otherwise presented themselves sufficient to allow the Respondent to overbear [the decedent's] own will").

Additionally, William Sr. might have had a motive to exercise undue influence for an improper purpose. That element "may be satisfied where the alleged influencer 'stood to benefit financially from such action' under circumstances in

29

which the alleged influencer's 'continued ability to support himself was dependent on' the challenged transaction." *Ray*, 2020 WL 1542028, at *32 (citations and footnote omitted). William Sr. stood to benefit financially from the Deed, and at trial, Petitioners introduced testimony suggesting that William Sr. owed some debts.[116] Yet no other evidence suggests that William Sr. was motivated to unduly influence his mother. *Cf. In re Kittila*, 2015 WL 688868, at *16 (Del. Ch.) ("The petitioners also have not shown that the Leaches had any particular motive to influence [the decedent], other than a general pecuniary motive that could apply to any beneficiary of a will."), *R. & R. adopted*, 2015 WL 935319 (Del. Ch. Mar. 04, 2015); *In re Est. of Porter*, 2007 WL 4644723, at *8 (Del. Ch. Dec. 31, 2007) ("There is, however, no evidence beyond the fact that individuals are often motivated by a desire for economic gain that bears on their subjective states of mind: no evidence was produced at trial suggesting that any negative effect [a daughter and her close friend]'s alleged actions or commentary had on [the decedent]'s relationships was motivated by a desire to increase [the daughter]'s inheritance."); *In re Will of McElhinney*, 2007 WL 2896013, at *4 (Del. Ch. Oct. 1, 2007) (explaining that, although an opportunity to acquire assets by inheritance may

---

[116] Tr. (Lavonne) at 469:16-470:5 (noting that William Sr. incurred debt from funding Edith's funeral and paying taxes).

motivate almost anyone's conduct, that does not "establish the necessary disposition or intent by a preponderance of the evidence").

Critically, even assuming all other elements were satisfied, Petitioners failed to demonstrate by a preponderance of the evidence the "actual assertion" of undue influence. Undue influence "is an excessive or inordinate influence" sufficient "to subjugate [the transferor's] mind to the will of another, to overcome h[er] free agency and independent volition, and to impel h[er] to [act in such a way] that speaks the mind of another and not h[er] own." *In re Will of James W. Henry*, 2021 WL 5816818, at *6 (Del. Ch. Nov. 10, 2021) (first alteration in original) (internal quotation marks omitted) (quoting *In re Langmeier*, 466 A.2d 386, 403)). "[I]f the evidence supports two equally plausible explanations for" a transfer, "one of which involves undue influence and the other does not[,]" the moving party has not met its burden of proof. *Id.*; *see also In re Will of Walls*, 2009 WL 5061996, at *9 (Del. Ch. Dec. 9, 2009) (finding petitioner failed to prove undue influence where there were "equally plausible" explanations for the challenged disposition); *McElhinney*, 2007 WL 2896013, at *5 (explaining that "the existence of a plausible explanation" for a disposition "undercuts any claim" that the disposition "would not have resulted but for the exercise of undue influence").

The evidence adduced at trial supports two plausible conclusions. On one hand, it is possible that William Sr. took advantage of his mother's weakened state

31

at the end of her life, improperly exerting his influence to cause her to deed the Property to him. On the other hand, it is undeniable that Edith loved her three living children equally.[117] She gifted two of her three children real property years before her death.[118] Therefore, a plausible, if not the most probable, explanation for the Deed is that in the final weeks of her life, Edith wished to treat William Sr. fairly by gifting him an equal share of the family property. Because Petitioners have not shown that undue influence is the more likely explanation for the Deed, they have not met their burden of proving that William Sr. actually exerted undue influence over Edith.

For the reasons above, Petitioners have failed to prove by a preponderance of the evidence that the Deed was the product of undue influence. The Deed is, therefore, valid.

### E. Lavonne Has Not Established Her Entitlement To Damages.

Although the Deed is valid, I recommend that the Court deny Lavonne's request for damages from Petitioners representing the rental value of the Property.

Importantly, Lavonne has not identified any legal theory that supports her request. She cites no analogous cases in which the Court has ordered damages for

---

[117] *See* nn.4-6, *supra*.

[118] JX 1-2, 4; *see also* Tr. (Ross Jr.) at 48:12-19, 64:7-16; Tr. (Garrett) at 399:8-9.

32

rental value in a title dispute. The parties are not co-owners, so she cannot maintain

an action for use and occupation under 25 *Del. C.* § 702.[119] Although a life tenant

"has a right to the undisturbed possession of the land and to the income and profits

thereof,"[120] the authority on which Lavonne relies to seek damages is inapposite.[121]

To the extent Lavonne suggests she is entitled to damages for trespass,[122] only "[a]

tenant in actual possession . . . has standing to bring a claim for trespass." *Jasinski*

*v. Singer*, 2024 WL 1257999, at *3 (Del. Ch. Mar. 25, 2024) (citing 49 Am. Jur. 2d

*Landlord and Tenant* § 426, Westlaw (database updated Feb. 2024)); *see also Frye*

*v. Est. of Raphaelson*, 2023 WL 5624717, at *12 (Del. Ch.) (explaining that a

landlord who was not "in possession of the property" and "did not occupy it" could

---

[119] *See* 25 *Del. C.* § 702 ("A tenant in common or a joint tenant or a coparcener may maintain against a cotenant an action for use and occupation.").

[120] *In re Est. of Bates*, 1994 WL 586822, at *3 (Del. Ch. Sept. 23, 1994) (internal quotation marks omitted) (quoting Moynihan, *Law of Real Property*, (1962 ed.), 58-61).

[121] *See Warrington v. Hignutt*, 31 A.2d 480, 482 (Del. Super. 1943) (explaining in an appeal from a judgment rendered by the Justice of the Peace Court, in a replevin action to recover a gas stove, that a life tenant may remove improvements made during the life tenancy and "[a]ll that is required of a tenant, is to leave the land in as good condition as it was when he received it" (citation and internal quotation marks omitted)); *Du Pont v. Peyton*, 136 A. 149, 154 (Del. Ch. 1927) (construing a will to entitle a life tenant to "dividends declared . . . out of the profits or net earnings" but not to distributions representing corporate capital (citation and internal quotation marks omitted)). As Petitioners point out, the Property is not and has never been an income-generating asset.

[122] *See* DOB at 9 ("Antanell's continued occupancy of the Property with the permission of Ross and Joseph represents a continuing trespass against Respondent's rights that has been ongoing since at least June of 2017.").

not assert a claim for trespass against a holdover tenant), *R. & R. adopted sub nom. Frye v. Raphaelson*, 2023 WL 5955577 (Del. Ch. Sept. 12, 2023). Nor is it "fair and equitable"[123] to order Petitioners to pay potentially tens of thousands of dollars in back-rent under the facts of this case.

Even if Lavonne had established her legal entitlement to rent, she failed to prove the fair rental value of the Property. The only evidence concerning the rental value of the Property is Lavonne's June 2018 letters requesting "lot rent" of $400 per month and Joe's agreement at trial that "$700 to $800 per month" would be appropriate rent, a statement I find wholly unconvincing.[124] *See Rende v. Rende*, 2023 WL 2180572, at *17 n.187 (Del. Ch. Feb. 23, 2023) (concluding that a damages award was not appropriate where, "despite the opportunity to do so, the Petitioners did not present sufficient evidence at trial to support such an award"). Because Lavonne failed to prove the rental value of the Property and "any award of damages would be speculative[,]"[125] I recommend that her request for damages be denied.

---

[123] *See* DRB at 4 ("[I]t is fair and equitable to enter a judgment against Petitioners because they actively prevented Respondent from utilizing her ownership in a profitable manner.").

[124] Tr. (Joe) 404:12-15 ("Q. And you think the appropriate rent for a property like that is about $700 to $800 per month; is that correct? A. Correct.").

[125] *Rende*, 2023 WL 2180572, at *17 n.187.

## III. CONCLUSION

For the reasons set forth above, I find that the Petitioners have not demonstrated by a preponderance of the evidence that the Deed is invalid for lack of capacity or undue influence. I further find that Respondents have not established their entitlement to damages in the form of rent. This is a final report pursuant to Court of Chancery Rule 144.[126] Any prior stay of exceptions is hereby lifted.

---

[126] *See* Ct. Ch. R. 144(d)(1) ("In actions that are not summary in nature or in which the Court has not ordered expedited proceedings, any party taking exception shall file a notice of exceptions within eleven days of the date of the report.").